**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

**UNITED STATES OF AMERICA**

v.                                                     Case No. 7:18-CR-58 (HL)

**MILTON WRENN**,

        Defendant.

**ORDER**

Before the Court is Defendant Milton Wrenn's Motion to Suppress Evidence. (Doc. 34). This matter came before the Court for an evidentiary hearing on April 21, 2021. One of the necessary witnesses was not available on that date. The hearing reconvened on August 24, 2021. At the conclusion of the second hearing, Defendant requested an opportunity to file a post-hearing brief following production of the hearing transcript. Both Defendant and the Government have now submitted their post-hearing briefs, and the motion is ripe for review. Upon consideration of the testimony and evidence produced during the two hearings, the Court **DENIES** Defendant's Motion to Suppress.

**I.    BACKGROUND**

*Traffic Stop*

Deputy Alan Patton is an officer with the Union County, Georgia Sheriff's Department. (Doc. 43, p. 6). He has been employed by the Department as a

patrol officer for eight years. (Id.). Deputy Patton completed training on how to investigate traffic accidents and traffic violations. (Id.).

On October 4, 2017, Deputy Patton was working the night shift, from 6:00 p.m. until 6:00 a.m. (Id. at p. 6-7). Just before 5:00 a.m. the morning of the 4th, Deputy Patton observed a silver car performing a U-turn from the from the far right-hand lane across five lanes of traffic on Highway 515 in Blairsville, Georgia. (Id. at p. 7). The officer testified that he was about 300 feet behind the vehicle before it made the turn. (Id.). Deputy Patton continued driving east while the other car drove west. (Id.). But he found the car's maneuver odd, so he slowed his vehicle and watched the other car in his rearview mirror. (Id. at p. 8). The car then made a second U-turn in the same fashion and began driving in the direction of the deputy. (Id.).

Deputy Patton slowed his patrol car again as he prepared to make a right-hand turn toward the Sheriff's Department. (Id. at p. 8-9). According to the deputy, the right-hand lane of the highway becomes a turn lane at that point. (Id. at p. 9). There is a yellow hash-marked area between the turn lane and the straight-through lane. (Id.). Cars are not supposed to drive through the hash-marked area. (Id.).

As the deputy moved into the turn lane, the silver car passed him in the hash-marked area and proceeded through the traffic light. (Id.). Deputy Patton then made the decision to initiate a traffic stop. (Id.). As he approached the

2

vehicle, Deputy Patton smelled a strong marijuana odor emanating from the car. (Id. at p. 10).[1] Deputy Patton contacted his sergeant for backup. (Id.). He approached the vehicle and requested the driver, Defendant Milton Wrenn, produce his driver's license. (Id.). The deputy informed Defendant that he pulled him over for failure to maintain his lane, stating that when Defendant made the two U-turns, he crossed over the fog line. (Id.). Deputy Patton then informed Defendant that he could smell marijuana and requested that Defendant hand it to him. (Id.).[2] Defendant produced a mason jar of marijuana from his console. (Id.). Defendant was not under arrest at that time. (Id. at p. 32).

Deputy Patton asked Defendant to exit his vehicle. (Id. at p. 11). Sergeant Hammond arrived around that time. (Id.). Deputy Patton placed Defendant under arrest for possession of marijuana. (Id. at p. 11, 28). When Defendant stated he had a medical marijuana card from Florida, the deputy reminded Defendant that he was in Georgia, not Florida. (Id.).

### Search Incident to Impound

Defendant was traveling alone. (Id.). Deputy Patton inquired whether Defendant could arrange for someone to retrieve the vehicle to avoid the

---

[1] Union County does not equip their patrol vehicles with dashboard cameras. (Id. at p. 10). The county also does not issue deputies body-worn cameras. (Id.).

[2] During cross examination, Deputy Patton clarified that Defendant did not hand the jar of marijuana to him. (Id. at p. 26-27). Rather, Defendant directed the officer to the center console after Defendant exited the car and was placed in handcuffs. (Id. at p. 27). Either Deputy Patton or Sergeant Hammond retrieved the jar from the center console of Defendant's vehicle. (Id.).

expense of a tow truck. (Id.). Defendant called someone. (Id.). Deputy Patton then transported Defendant to the jail. (Id. at p. 12). About fifteen to twenty minutes transpired between the time of the initial stop and Deputy Patton taking Defendant to the county jail. (Id.).

The person Defendant called to collect his car never arrived. (Id. at p. 13). Around 7:00 a.m., Sergeant Hammond, who stayed with the vehicle after Deputy Patton left the scene with Defendant, called a wrecker service. (Id. at p. 13, 30, 41). Officers conducted an inventory of the vehicle before it was towed. (Id. at p. 13). The purpose of the inventory was to identify any valuables in the car "to make sure that nothing—before it's turned over to the wrecker service, to make sure they stay in the car." (Id. at p. 14). According to Department policy, the officers are to seize any contraband located during an inventory search. (Id. at p. 40-41). The inventory search of Defendant's car revealed a white garbage bag containing marijuana, a set of digital scales, and some electric bills. (Id. at p. 14-15, 38-39, 41-42).

Around eight o'clock that same morning, Investigator Daren Osborn, the Lieutenant over Investigations for the Union County Sheriff's Department, received a telephone call from Captain Deaton, the Department's narcotics investigator. (Id. at p. 35-36). Captain Deaton was out of town and asked that Investigator Osborn follow up on Defendant's case. (Id. at p. 36). Osborn spoke with Deputy Patton to gather the details of the traffic stop and with Deputy

Hogsed, who conducted the inventory search. (Id. at p. 36, 38). He then took the marijuana seized from Defendant's vehicle to the local post office to ascertain the official weight of the drugs. (Id. at p. 37). The total weight of the bag of marijuana was 2 pounds and 15.7 ounces. (Id. at p. 46).

Investigator Osborn also examined other items retrieved from Defendant's car during the inventory search. (Id. at p. 37). Those items included several utility bills issued by Colquitt County EMC to Defendant. (Id.). The bill for services from June 16, 2017 through July 11, 2017 totaled $85.05. (Doc. 41-2, Gov't Ex. 7). The bill for services from July 11, 2017 through August 10, 2017 totaled $314.57. (Doc. 41-3, Gov't Ex. 8). Based on his training and experience as a law enforcement officer, Investigator Osborn believed the vast discrepancy between the two bills to be evidence of a grow house operation. (Doc. 41, p. 42). Investigatory Osborn contacted Investigator Jerome Burgess in Colquitt County Sheriff's Department to relay his findings. (Id. at p. 43).

### *Issuance of Search Warrant*

Jerome Burgess has worked in law enforcement for approximately 32 years. (Doc. 44, p. 6). He presently is employed as a deputy sheriff with the Thomas County Sheriff's Department. (Id. at p. 5). He also serves as the Chief of Police for the City of Pavo, Georgia. (Id.). At the time of Defendant's arrest, Burgess worked as an investigator with the Colquitt County Sheriff's Department.

5

(Id. at p. 6). He is a certified marijuana examiner and has completed narcotics investigation courses in both Georgia and Florida. (Id. at p. 7-8).

Investigator Burgess testified that he received a telephone call from Union County Sheriff's Department Investigator Osborn on October 6, 2017. (Id. at p. 8). Investigator Osborn apprised Burgess that following a traffic stop of Defendant, officers seized several pounds of marijuana along with two utility bill receipts addressed to Milton E. Wrenn, Jr. at 437 South Morris Road, Lot 4 in Moultrie, Georgia. (Id.; Doc. 41-2, Gov't Ex. 7; Doc. 41-3, Gov't Ex. 8). There was a significant difference between the two bills. (Id. at p. 8). Osborn opined that based on his narcotics experience, the combination of the large amount of marijuana and the extreme inconsistency in the utility bills indicated the possibility of a marijuana grow operation. (Id. at p. 8-9).

Investigator Burgess was not able to follow up on Osborn's information immediately. (Id. at p. 9). He placed the case on a list of other drug-related complaints received in the county. (Id.). On October 12, 2017, Investigator Burgess and Deputy Alexander McDowell were checking on another drug complaint near Defendant's Morris Road address. (Id. at p. 10). On the way back to the Department, the officers decided to drive past Defendant's address. (Id.).

There are four mobile homes located at 437 South Morris Road, Lots 1, 2, 3, and 4. (Id.). The address provided by Investigator Osborn was Lot 4. (Id.). The property itself is open acreage with no trees. Burgess parked his unmarked

pickup truck on the northeast corner of Lot 4, approximately 30 yards from the porch on the east side of the home. (Id.). As he exited the truck, Burgess immediately smelled an overwhelming odor of marijuana. (Id.). The odor strengthened as he approached Defendant's residence. (Id. at p. 10-11).

Investigator Burgess knocked on the door. (Id. at p. 11). No one answered. (Id.). The house was dark, but it was evident from markings in the grass that there was regular travel in the area. (Id.). The windows were covered with a black material. (Id.). The officer did not hear the air conditioning or any other appliances running, yet he observed the power meter moving rapidly. (Id.). Each of these observations corroborated Investigator Osborn's report. (Id. at p. 12).

Burgess called Investigator Michael Cox and Officer Channing McDowell. (Id.). His initial plan was to have the two officers secure the premises while he returned to the Department to prepare a search warrant. (Id.). Instead, he remained on the scene and contacted Chief Magistrate Judge J.J. McMillan. (Id.).[3] Judge McMillan responded that he was in the area and could stop by the property. (Id.). Judge McMillan testified that it was not unusual for him to meet law enforcement officers at a scene to sign search warrants. (Id. at p. 45). It is a matter of convenience, particularly when officers are far out in the county. (Id.).

---

[3] Judge McMillan is the Chief Magistrate Judge in Colquitt County, Georgia. (Doc. 44, p. 44). He has served as a magistrate judge for over fifteen years. (Id.). Prior to becoming the Magistrate, Judge McMillan worked for the Colquitt County Sheriff's Department for twelve and a half years. (Id.).

Investigator Cox provided Burgess with a form search warrant application, which Burgess then completed by hand. (Id. at p. 12-13). He included a brief summary of his qualifications and the information he received from the Union County Sheriff's Department along with his observations upon arriving at Defendant's address. (Id. at p. 13-14; Doc. 41-5, Gov't Ex. 5).

Judge McMillan arrived twenty to thirty minutes later, around 8:12 p.m. (Doc. 44, p. 14). The Judge parked to the rear of Investigator Burgess' truck. (Id. at p. 16). Investigator Burgess remembers Judge McMillan commenting on the smell of marijuana; however, Judge McMillan testified that he does not recall that comment. (Id. at p. 16, 47, 54). Judge McMillan never approached Defendant's residence. (Id. at p. 16, 47). He remained by the cars while he reviewed the warrant application and, upon determining there was probable cause to issue the warrant, signed the search warrant. (Id. at p. 16, 48). During his testimony, Judge McMillan emphasized that he was not on the scene as a witness. (Id. at p. 56). And whether he detected the odor of marijuana had no bearing on his finding of probable cause. (Id.). He made his assessment of probable cause based on the four corners of the search warrant application alone. (Id.).

The search warrant states that there is reason to believe that marijuana, marijuana plant material, and other substances or compounds containing tetrahydrocannabinol ("THC"), which are fruits of the crime of possession of marijuana, are being concealed at 437 South Morris Road, Lot 4 in Moultrie,

Colquitt County, Georgia. (Doc. 41-5, Gov't Ex. 5).  The warrant further provides that based on the affidavit of Investigator Burgess, there is probable cause that a crime is being committed. (Id.). The warrant therefore authorized entry into the described premises to search and seize "the person, premises, property and curtilage" described in the warrant. (Id.).

After executing the warrant, Judge McMillan requested that the officers not initiate their search until he exited the premises. (Id.). He did not participate in the search of the property. (Id. at p. 47).

### Seizure of Computer

Law enforcement officers entered Defendant's home approximately ten minutes after Judge McMillan left. (Id. at p. 17). The marijuana grow operation was immediately apparent. (Id. at p. 18). Where one typically would find a washer and dryer, the officers discovered a watering filtration system. (Id.). Injection lines attached to a full container of water ran throughout the home and the individual grow rooms. (Id.). The officers found several jars in the living room and kitchen areas containing a green leafy residue. (Id.). In the living room, they noted a jar and tray, both containing marijuana, and a drying basket. (Id.). The officers further identified a cloning room; a juvenile growth room; an adolescent growth room with middle-aged, non-flowering plants; and a flowering room, where the plants were budding. (Id. at p. 18-19). In total, there were around 233 marijuana plants. (Id. at p. 22). Various records in the home, including utility bills, credit card

9

bills, prescription bottles, and photographs, confirmed that Defendant resided in the home. (Id. at p. 19, 22-23).

Investigator Burgess testified that a laptop computer sitting on a table in the living room area was open and on, as evidenced by the screen saver. (Id. at p. 21). Law enforcement collected the laptop. (Id. at p. 22). According to Burgess, it is common for cell phones and computers to contain images and data "associated with criminal activity or [illicit] drug activity, ledgers, along with photos of, you know, their narcotics that they're selling and also correspondence between them and the people that are purchasing these substances from the owner of the phone or the computer." (Id. at p. 23).

Investigator Burgess applied for a search warrant for the laptop computer on November 17, 2017. (Id. at p. 24; Doc. 41-4, Gov't Ex. 9). A forensic search of the computer revealed images of Defendant's granddaughter and research pertaining to bedding material, fertilizer, and information regarding the cultivation of marijuana. (Id. at p. 26). The computer additionally contained photographs of nude children engaged in sexual activity with adults. (Id.). On November 13, 2018, a grand jury in this district returned a single count indictment charging Defendant with Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). (Doc. 1).

## II.     DISCUSSION

Defendant's Motion to Suppress raises four issues. First, Defendant argues that the officer who conducted the initial traffic stop in Union County did not have probable cause for the stop.[4] Next, Defendant challenges the search of his vehicle, suggesting that the jar of marijuana retrieved from the center console should be suppressed because the officers did not advise Defendant of his Miranda rights prior to Defendant revealing the location of the drugs. Defendant also avers that the officers did not abide by the county's impound and inventory procedures. Defendant further argues that the search of his residence in Colquitt County violated his Fourth Amendment rights because the magistrate judge who issued the search warrant impermissibly interjected himself into the investigation. Finally, Defendant contends that law enforcement officials exceeded the scope of the search warrant when they seized his laptop computer.

### A.     Traffic Stop

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Temporary detention of an individual

---

[4] Defendant raised this issue in his initial motion to suppress. His post-hearing brief, however, does not address the legality of the traffic stop. It is not clear to the Court whether Defendant has abandoned this argument. Additionally, Defendant's post-hearing brief presents arguments not addressed in his initial brief. For the sake of completeness, the Court has reviewed all issues raised in both Defendant's motion and post-hearing brief.

11

during a traffic stop by the police, "even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'" within the meaning of the Fourth Amendment. <u>Whren v. United States</u>, 517 U.S. 806, 809-10 (1996). A traffic stop accordingly is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." <u>Id.</u> at 810. As a general rule, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." <u>Id.</u> Probable cause must be supported by more than mere suspicion but does not require the same "standard of conclusiveness and probability as the facts necessary to support a conviction." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1195 (11th Cir. 2002).

The evidence presented during the hearing demonstrates that probable cause existed for the traffic stop. Georgia law requires that a vehicle "be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." O.C.G.A. § 40-6-48(1). "Weaving without reason into nearby lanes violates [O.C.G.A. § 40-6-48(1)] and justifies a stop." <u>Rayo-Leon v. State</u>, 281 Ga. App. 74, 75 (2006) (quotation marks and citation omitted).

Deputy Patton observed Defendant violating O.C.G.A. § 40-6-48 at three separate instances. Defendant conducted two illegal U-turns, departing from the far right-hand lane and crossing five lanes of traffic and breaching the fog line. Deputy Patton testified that there were no signs posted on the highway

12

prohibiting a U-turn. (Doc. 43, p. 17). It was the unsafe way Defendant conducted the turn that constituted a violation of the law. (Id.). Defendant then passed the officer in a hashed-marked area and not in the designated through lane. These violations provided probable cause for the traffic stop. The Court therefore **DENIES** Defendant's motion to suppress the initial traffic stop.

## B.   Search of Defendant's Vehicle

Next, Defendant moves the Court to suppress any evidence obtained following Defendant's removal from his vehicle and during the inventory search of Defendant's vehicle. Defendant argues that evidence of the jar of marijuana should be suppressed because the law enforcement officer provided no Miranda warning. Defendant further argues that the subsequent inventory search of his car was not conducted pursuant to a reasonable police policy and therefore violated Defendant's Fourth Amendment rights.

### 1.  Retrieval of Jar of Marijuana

Deputy Patton testified that he smelled marijuana as he approached Defendant's vehicle. (Doc. 43, p. 10). After Defendant exited the vehicle and was placed in handcuffs, Deputy Patton stated that he smelled marijuana and asked Defendant about the location of the drugs. (Id. at p. 24-25). Defendant indicated that the drugs were in a jar in the center console of his car. (Id. at p. 25, 27). The officers then located and retrieved the jar. (Id. at p. 27). Defendant argues that

this evidence should be suppressed because the officers did not Mirandize Defendant before inquiring about the marijuana.

"The right to Miranda warnings attaches when custodial interrogation begins." United States v. Acosta, 363 F.3d 1141, 1148 (11th Cir. 2004) (citing Miranda v. Arizona, 384 U.S. 436, 479 (1966); Dickerson v. United States, 530 U.S. 428, 435 (2000)). Courts generally apply a two-part test to determine whether an individual is in custody for Miranda purposes: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995). As the Eleventh Circuit noted in Acosta, "[a] reasonable person knows that he is not free to drive away from a traffic stop until it is completed, just as a reasonable person knows that he is not free to walk away from a Terry stop until it is over." 363 F.3d at 1149. "If the lack of freedom to leave were decisive, which is to say if every phrase of the Miranda opinion is to be applied literally, then all traffic stops . . . generally would be subject to the requirements of that decision." Id. The Supreme Court held otherwise in Berkemer v. McCarty, 468 U.S. 420 (1984).

In Berkemer, the Supreme Court explained that "[t]wo features of an ordinary traffic stop mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely.'" 468 U.S. at 437 (quoting

Miranda, 384 U.S. at 467)). "First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief." Id. Unlike a stationhouse interrogation, which commonly is prolonged, the "vast majority of roadside detentions last only a few minutes." Id. The motorist's expectations "are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way." Id. Second, "circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." Id. at 438. The "atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in Miranda." Id. at 438-39. Thus, the typical traffic stop is more analogous to a Terry stop than to a formal arrest. Id. 439.

Under the Fourth Amendment "a policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.'" Id. (quoting United States v. Brigoni-Ponce, 422 U.S. 873, 881 (1975)). "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" Id. (quoting Terry v. Ohio, 392 U.S. 1, 29 (1968)). An officer thus may ask a reasonable number of questions to ascertain the identity of the detainee

15

and to elicit information confirming or dismissing the officer's suspicions. Id. If the detainee's responses, which he is not required to give, do not provide probable cause for arrest, he must be released. Id. at 439-40. The "comparatively nonthreatening character" of a Terry stop eliminates the necessity for imposing the dictates of Miranda. Id. at 40. Similarly, the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." Id. But, where a detained motorist "thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." Id. (citing Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).

Here, there is no evidence suggesting that Deputy Patton should have given Defendant a Miranda warning prior to inquiring about the source of the marijuana odor. The initial purpose of the traffic stop was to issue a standard traffic citation. When, Deputy Patton exited his patrol car and detected the smell of marijuana, he then had probable cause to detain Defendant and to ask questions to confirm his suspicions. Deputy Patton did not take Defendant into custody for the purposes of Miranda until after he retrieved the jar of marijuana from Defendant's center console and placed Defendant under arrest. Any statements made by Defendant prior to his arrest therefore are admissible. Accordingly, there is no basis for suppressing evidence of the drugs found in the

interior of Defendant's car. The Court **DENIES** Defendant's motion to suppress this evidence.

### 2.    Inventory Search

Defendant acknowledges that inventory searches are "a well-defined exception to the warrant requirement of the Fourth Amendment." Colorado v. Bertine, 479 U.S. 367, 371 (1987) (citing Illinois v. Lafayette, 462 U.S. 640, 643 (1983); South Dakota v. Opperman, 428 U.S. 364, 367-76 (1976)). "[R]easonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment." Id. at 374. The Supreme Court has found that "inventory searches serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." Id. at 372. Thus, deference is afforded "to police caretaking procedures designed to secure and protect vehicles and their contents within police custody." Id.

The Union County Sheriff's Department maintains an official policy for impounding and inventorying vehicles:

> When the driver/owner of a vehicle is arrested, and if the vehicle is subject to a lawful impound, the arresting deputy will make an inventory of the vehicle for valuables.

(Doc. 37-4, Gov't Ex. 3). Relevant in this case is the part of the policy permitting impoundment of a vehicle when the driver of the vehicle has been arrested and "[t]he driver has made a specific request for the disposition of the vehicle . . . and

17

the deputy has made a reasonable[ ] but unsuccessful effort to comply with this request." (Id.).

The policy further outlines the purpose of conducting an inventory of the vehicle prior to impoundment:

1.     Protection of the owner's property while it remains in Agency custody;

2..    The protection of the Agency from potential danger; and

3.     The protection of the Agency against false claims of stolen or lost property.

(Id.).

Defendant argues that the inventory search conducted prior to impoundment of Defendant's vehicle was improper because the officers did not make a reasonable effort to comply with Defendant's request that a friend retrieve his car from the side of the road. Defendant's argument lacks merit. The evidence demonstrates that Deputy Patton conducted the initial traffic stop just before 5:00 a.m. (Doc. 43, p. 7, 12). The traffic stop lasted approximately fifteen to twenty minutes. (Id. at p. 12). Prior to transporting Defendant to jail, Deputy Patton permitted Defendant to call someone to pick up his car. (Id. at p. 11-12). Another officer remained with the vehicle and waited for the driver for about two hours prior to calling the wrecker service. (Id. at p. 13). Defendant argues, without support, that waiting two hours without making any further attempt to contact Defendant's friend was not reasonable. The Court cannot agree. The

Court concludes that the law enforcement officer properly followed the guidelines of the county impound and inventory policy and that he waited more than a sufficient period of time for a secondary driver before contacting the towing service. The Court therefore **DENIES** Defendant's motion to suppress evidence obtained during the inventory search.

### C.    Issuance of Search Warrant

Defendant challenges the search warrant issued for his home at 437 South Morris Road, Lot 4. Defendant argues that Magistrate Judge J.J. McMillan improperly interjected himself into the investigation of Defendant's residence and, as a result, became a witness. Based on his belief that Judge McMillan was not neutral and detached, Defendant maintains that the warrant was not properly executed and that the fruits of the warrant should be suppressed.

"The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested." United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (citing Zurcher v. Stanford Daily, 436 U.S. 547, 558 (1978)). The search warrant must be reviewed by "a neutral and detached magistrate" prior to its execution. Coolidge v. New Hampshire, 403 U.S. 443, 450 (1971). Separate review by a judicial officer is "a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting

out crime.'" <u>Lo-Ji Sales, Inc. v. New York</u>, 442 U.S. 319, 326 (1979) (quoting <u>Johnson v. United States</u>, 333 U.S. 10, 14 (1948)).

The search warrant application lists a series of factors that, together, established probable cause to issue the search warrant for Defendant's home:

(a)    a report from the Union County Sheriff's Department that officers confiscated a large quantify of marijuana from Defendant's vehicle on along with two contrasting Colquitt EMC bills addressed to Defendant—items believed to be evidence of a possible indoor marijuana grow operation;

(b)    the strong smell of marijuana emanating from Defendant's home;

(c)    the rapidly moving power meter when officers observed that the air conditioning unit was not operating; and

(d)    the lack of visible interior or exterior lighting.

Defendant contends that the odor of marijuana from the home was the "lynchpin upon which the warrant was based." (Doc. 43, p. 11; <u>see also</u> Doc. 49, p. 12). And, when the Judge McMillan arrived at the house, he placed himself "within the odiferous cloud of marijuana odor surrounding [Defendant's] mobile home" and interjected himself into the "activities of law enforcement." (Doc. 49, p. 14). The evidence does not support Defendant's position.

In <u>United States v. Leon</u>, the Supreme Court stated that "[a] magistrate failing to 'manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application' and who acts instead as 'an adjunct

law enforcement officer' cannot provide valid authorization for an otherwise unconstitutional search." 468 U.S. 897, 914 (1984) (quoting Lo-Ji Sales, Inc., 442 U.S. at 326-27). What sort of judicial conduct amounts to abandonment of neutrality is not well defined.

In Jo-Li Sales, Inc., an investigator presented two videos to the town justice for a determination of whether the videos violated New York's obscenity laws. 442 U.S. at 321. After reviewing the videos, the town justice concluded that the videos were obscene and issued a warrant authorizing a search of the store selling the materials. Id. The town justice then accompanied the investigator on the raid of the store and viewed twenty-three additional videos. Id. at 322. The Supreme Court held that that the town justice "did not manifest that neutrality and detachment demanded of a judicial officer" when he "allowed himself to become a member, if not the leader, of the search party which was essentially a police operation." Id. at 326-27. The Court found under the circumstances that the town justice "was not acting as a judicial officer but as an adjunct law enforcement officer." Id. at 327.

In United States v. Martin, 297 F.3d 1308 (11th Cir. 2002), the Eleventh Circuit considered other ways in which a judicial officer may abdicate his neutrality. The Court in Martin pointed to United States v. Decker, 956 F.2d 773, 777 (8th Cir. 1992), where the Eighth Circuit concluded that a magistrate judge "abandoned his duty to act in a neutral and detached manner when he signed a

21

search warrant without reading it." The Court also examined <u>United States v.</u> <u>McKneely</u>, 810 F. Supp. 1537, 1547 (10th Cir. 1993), where the Tenth Circuit found that a magistrate judge impermissibly relied upon his relationship with the police officer rather than conducting an independent review of the facts contained in the warrant application. In other words, a magistrate judge should serve as more than a "rubber stamp." <u>Martin</u>, 297 F.3d at 1317. "Whatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement." <u>Shadwick v. City of Tampa</u>, 407 U.S. 345, 350 (1972).

Judge McMillan does not recall whether he smelled marijuana when he arrived at Defendant's residence. (Doc. 44, p. 47). Based on Investigator Burgess' testimony regarding the overwhelming smell of marijuana thirty yards from the door to the mobile home, though, it is more likely than not that the Magistrate Judge also detected the odor. (<u>Id.</u> at p. 10). But Judge McMillan never approached the home, nor did he enter the home or engage in the investigation in any direct manner. (<u>Id.</u> at p. 47). Judge McMillan testified that when he arrived at the residence, he parked behind Investigator Burgess' truck, which was approximately thirty yards away from the house. (<u>Id.</u>). He then reviewed the warrant affidavit and, concluding that the affidavit contained sufficient information to establish probable cause, the Magistrate Judge signed the warrant and authorized the search of Defendant's residence. (<u>Id.</u>). Whether he smelled

marijuana had no bearing on how he ruled on the warrant application. (Id. at p. 56-57).

There is no evidence that the existence of the marijuana odor swayed Judge McMillan's assessment of the warrant application. Nor is there evidence that the mere detection of the smell interfered with Judge McMillan's neutrality such that he can be said to have abandoned his judicial role and taken on the role of law enforcement. Moreover, while Investigator Burgess did testify that the strong smell of the narcotics quickly changed the course of the investigation, the smell did not provide the sole basis for the warrant application as Defendant suggests. Rather, the smell, combined with the information provided by the Union County Sheriff's Department and Investigator Burgess' observations of the rapidly moving electric meter and the blacked-out windows, formed the investigator's belief that there was probable cause to apply for the warrant. The Court accordingly finds that the warrant was properly issued and **DENIES** Defendant's motion to suppress.

### D.   Seizure of Laptop

Defendant's final argument is that seizure of the laptop computer exceeded the scope of the search warrant. The warrant directly authorized seizure of "marijuana, marijuana plant material, [and] any and all substances and or compounds containing Tetrahydrocannabinol," which are fruits of the crime of possession of marijuana, O.C.G.A. § 16-13-30. (Doc. 41-5, Gov't Ex. 5).

Defendant claims that "[i]t is patently unreasonable to think that a laptop computer could be any of those things." (Doc. 49, p. 18). Defendant further argues that the "plain view" doctrine did not authorize seizure of the computer because there is nothing inherently incriminating about a laptop.

"The 'plain view doctrine' permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006) (citing Horton v. California, 496 U.S. 128, 136-37 (1990); United States v. Hromada, 49 F.3d 685, 690 n.11 (11th Cir. 1995)). "An example of the applicability of the 'plain view' doctrine in the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." Horton, 496 U.S. at 135 (quoting Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971) (opinion of Stewart, J.) (internal quotation marks omitted)). The officers must have probable cause to believe that the object located in plain view is contraband. Minnesota v. Dickerson, 508 U.S. 366, 375 (1993). If the incriminating character of the object is not immediately apparent, "the plain-view doctrine cannot justify its seizure." Id.

As previously established, the officers entered Defendant's residence pursuant to a valid warrant to search for and seize evidence of marijuana

24

possession. Upon entering the trailer, the officers immediately identified evidence not just of simple marijuana possession but of a marijuana growing enterprise. The officers located the laptop computer sitting open on a table in the living area of the home in close proximity to a jar and a tray containing marijuana and a drying basket. The computer was operational, as evidenced by the appearance of the devices screen saver. There is no question that the laptop is not "marijuana, marijuana plant material, [and] any and all substances and or compounds containing Tetrahydrocannabinol," as identified by the search warrant. The question before the Court is whether the incriminating nature of the computer was immediately apparent such that seizure of the device without a warrant satisfied the requirements of the Fourth Amendment.

Since the Supreme Court's ruling in <u>Coolidge</u>, the Court has "indicate[d] that the use of the phrase 'immediately apparent' was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." <u>Texas v. Brown</u>, 460 U.S. 730, 741 (1983). In <u>Brown</u>, the Court reaffirmed the statement of the rule expressed in <u>Payton v. New York</u>, 445 U.S. 573, 587 (1980) as consistent with the Fourth Amendment. <u>Payton</u> provides that "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." <u>Payton</u>, 445 U.S.

at 587. "[P]robable cause is a flexible, common-sense standard . . . merely require[ing] that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime." <u>Brown</u>, 460 U.S. at 742 (internal quotation marks and citation omitted). "A practical, nontechnical probability that incriminating evidence is involved is all that is required." <u>Id.</u> (internal quotation marks and citation omitted).

The presence of a functioning laptop computer amidst an obvious and extensive marijuana grow operation provided probable cause for the officers to believe that the computer contained incriminating evidence relating to drug production activity. As Investigator Burgess testified, it is common for cell phones and computers to contain images and data "associated with criminal activity or elicit drug activity, ledgers, along with photos of, you know, their narcotics that they're selling and also correspondence between them and the people that are purchasing these substances from the owner of the phone or the computer." (<u>Id.</u> at p. 23). Under the circumstances, it was reasonable for an officer in Investigator Burgess' position to believe that the laptop contained additional evidence of a narcotics crime. The Court accordingly **DENIES** Defendant's motion to suppress the laptop computer.

26

III.    **CONCLUSION**

For the foregoing reasons, Defendant's motion to suppress (Doc. 34) is

**DENIED**.

**SO ORDERED**, this 27th day of December, 2021.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

aks